Pauline FRENCH, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–16878.

Court of Criminal Appeals of Oklahoma.

Sept. 27, 1972.

**854**

Ernest R. Anthis, Jr., Muskogee, for appellant.

Larry Derryberry, Atty. Gen., Mike Jackson, Asst. Atty. Gen., for appellee.

BUSSEY, Presiding Judge.

Appellant, Pauline French, hereinafter referred to as defendant, was charged in the District Court of Muskogee County, Oklahoma, with the offense of Murder and was convicted of the lesser included offense of Manslaughter in the First Degree; her punishment was fixed at fifteen (15) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial L. D. Hamlin testified that in November 1970, he was employed as the City Marshall of Porum, Oklahoma, and was a close personal friend of both the defendant and her husband, Tommy French. At approximately 11:00 a. m. on November 13, 1970, the defendant came to the courtroom of the City Hall and asked for the "sheriff." Defendant pulled out a gun and demanded that he give her his weapon. At her direction, he placed his gun in her purse. She asked him where Tommy was and stated that she was Belle Starr and that she was going to kill Tommy French. She made him unlock the prisoners and backed out of the door. He next saw her sometime later as he and two officers were going to the defendant's and Tommy French's house. The defendant was driving a two-ton Ford stock pickup with his [Hamlin's] wife riding as a passenger. They proceeded to the house and upon entering observed Tommy French lying in the living room with his face to the floor. They proceeded to a school house and Hamlin called his house and talked to his wife. They returned to Porum and he observed his wife standing in front of a bar. He placed his wife in the vehicle and took her to Bill Spradlin's house. He returned to Main Street and observed the defendant with a gun in each hand talking to Gib Warren. She walked across the street and entered a cafe and remained approximately five minutes. He heard a gunshot. Shortly thereafter, Bill Reynolds brought her out of the cafe and handed him the two guns. He testified that the total elapsed time from the time he first saw the defendant until she was arrested was approximately two or two and one-half hours.

Geneva Hamlin, the marshall's wife, testified that on the morning in question, the defendant came to her house some time between 10:30 and 11:30. She had been drinking and told Geneva that she had L. D.'s gun. After having two drinks, defendant stated that she wanted to go home because she was looking for Tommy and was going to kill him. She testified that

she did not inquire why and because the defendant had been drinking, she "just went along with her." They proceeded to the defendant's house and the defendant called her sister. She attempted to call her sister again, got mad, jerked the phone off the wall and threw it outside. Defendant continued to state that she was going to kill Tommy and "just ride on." (Tr. 61) Defendant started to take a shower when Tommy arrived. He knocked on the front door and Geneva answered it telling him to leave. Tommy stated that it was his house and that he was coming in. The defendant came into the room with a gun in both hands. Geneva attempted to have the defendant sit down and talk everything over. Defendant stated, "You better sit down and shut up or I will kill you, and Tommy said, 'Well, you better sit down or she will.'" (Tr. 65) Tommy started emptying ash trays and pushed Geneva into a chair. She further testified that he turned around to pick up a cigarette or something on the floor and as he started back up, the defendant shot him. She testified that immediately before the shot was fired, Tommy had not said anything to the defendant, nor had he made any aggressive moves toward her. Defendant ran into the bathroom and Geneva grabbed her and said, "Let's go." They got into Tommy's big truck and proceeded to Geneva's house where the defendant, who was only partially clothed, put on a pair of jeans. They proceeded back to Porum; Geneva said Pauline "was scared and I told her that I would cash a check for her so that she could get out of town." She walked straight through the store and tried to find her husband, L. D. Her husband put her in a car and took her to Bill Spradlin's house. She further testified that the defendant still had the two guns with her when she got out of the truck.

On cross-examination, she testified that earlier that morning she received a telephone call from the defendant who stated that she was in Tulsa. Defendant stated that she was scared to go home and wanted to go to Tacoma, Washington. Geneva told the defendant that she could stay at

her house and the defendant advised her that she was coming that day. Shortly thereafter, Tommy French called Geneva and she informed him that the defendant was coming to her house. Tommy asked her to try to keep the defendant from going downtown and embarrassing him and L. D. She agreed to attempt to keep the defendant at her house.

Bill Reynolds testified that on November 13, 1970, he first saw the defendant in front of a bar talking to Gib Warren. The defendant crossed the street and entered a cafe carrying a gun in each hand. He followed her into the cafe and observed her having a conversation with a person sitting down. The defendant crossed both hands behind her and he jerked the guns from her grasp. One of the guns discharged as it was jerked from her hand. He walked her out to the sidewalk and turned her over to Bill Spradlin.

Deputy Spradlin testified that he lived in Porum all his life and knew both the defendant and Tommy French. He testified that on the day in question, he had first observed the defendant in a truck coming toward town. He, Doc Hamlin and Ray Jordan proceeded on to the defendant's home. Upon opening the door, he observed Tommy French lying on the floor in a pool of blood. They returned to town and observed the truck defendant had been driving sitting behind Ward's store. They drove around the block, picked up Mrs. Hamlin and took her to Spradlin's house. They then proceeded to downtown Porum and observed the defendant standing in front of a bar. He had a conversation with Bill Reynolds and shortly thereafter, Reynolds brought her out of the cafe.

Johnny Thornton, an investigator for the District Attorney's office, testified that he arrived in Porum between 1:00 and 2:00 on the afternoon in question. After observing the defendant being taken into custody, he proceeded to the defendant's residence. He observed Tommy French lying on the floor in the front room with a bullet hole in his left eye. He searched his person and the immediate room for weap-

ons and found none. He testified that there was an exit wound on the back of French's head and a bullet hole in the wall of the room.

Kenneth Casey testified that he was employed as an ambulance driver. On the afternoon in question, he arrived at the French residence at approximately 2:00. He picked up a body lying on the floor and transported it to the hospital.

Dr. Gafford, a pathologist, testified that he examined the body of Tommy French at the General Hospital on the afternoon in question and subsequently performed an autopsy the following morning. The victim died of a gunshot wound that entered his head just at the left of the inner aspect of the left eye, and exited in the middle of the back of the head. In his opinion, the bullet was fired on a direct line by a weapon of fairly high muzzle velocity.

For the defense, Jess Spradlin testified that he had lived in Porum for approximately 50 years and was the father of Deputy Bill Spradlin. On the morning of November 13, Tommy French asked if he would take him to Tahlequah. He (French) stated that defendant's father had called him the night before and said that the defendant was sick.

Virgil Davidson, the defendant's father, testified that he did not call Tommy French and say that the defendant was sick. He testified that he never called French in his life.

Eudean Yeargain, the defendant's sister, testified that on November 5, 1970, the defendant came to her home in Tahlequah. The defendant had knots on her head, a cut on her head, and blue marks on her back. After she cleaned up her wounds, they left the defendant's pickup at the house and proceeded to a neighbor's house to hide from Tommy French. They stayed at the neighbor's for several days and returned to her home to see if the pickup was still there. Defendant drove the pickup and they returned to the neighbor's house. They stayed at the neighbor's house for an additional two days. She and the defendant returned to her home and then she (Eudean) went to visit her father. While she was at her father's house, Tommy French called and wanted to know where the defendant was. She informed him that the defendant was at her house. Tommy told her to tell the defendant to get the pickup home or "it would be hell to pay." (Tr. 185.)

The defendant testified that on November 5, she was assisting her husband who was clipping a horse's foot. The horse jumped and Tommy became mad at her and started whipping her with the bridle across her head and back. She ran to the house, grabbed the pickup keys and then drove to her sister's house in Tahlequah. They left the pickup in front of Eudean's house and drove to a neighbor's house several miles away. They stayed there four days and returned to her sister's house and got the pickup. They returned to the neighbor's house and stayed two additional days. She testified that when her sister returned from a visit with her father, she informed her of the telephone conversation with Tommy. She remained at her sister's house until Thursday night and decided that she was going to take the pickup back home. She went to a friend's house at Tahlequah and spent the night. The next day, she returned to her sister's house and got the gun to use for protection against her husband. She stopped by her husband's brother's house, Jimmy French, and told them that she was scared to go home. Jimmy told her that it was as much her home as it was her husband's and that she should go on home. As she neared the outskirts of Porum she saw Tommy's truck sitting near Jeff Spradlin's house. She testified that she became very scared just from the sight of the truck. She knew that Doc Hamlin had a gun and that he was the only person that would give a gun to Tommy. She then went to the City Hall and took Doc's gun at gunpoint. She denied stating that she was going to kill Tommy or that she was Belle Starr. Earlier that morning, she had called Geneva Hamlin, who had offered to hide her. She left the City Hall with Doc's gun in her purse and went to

Geneva's house. Shortly after she arrived at Geneva's house, Geneva received a telephone call. All Geneva said was "yes" and "no." Geneva suggested that they go to her house and she said that she would rather stay there. She finally agreed to go to her home and she and Geneva drove there in the pickup. They entered the house and she locked all the doors. They mixed a drink and she suggested that Geneva go to the barn and get some steaks, while she took a bath. As she was disrobing to take a bath, Tommy came up to the front porch. She told him not to come in and grabbed the gun, which was lying on the television. Tommy said that this was his house too, and Geneva got up and opened the door. She further testified that Tommy and Geneva started coming at her from different sides. She told Geneva to not crowd her and to get away. Tommy told Geneva to sit down and not crowd her, and he kept coming towards her, backing her into the kitchen. She testified that she had the guns in each hand because she was scared to death. She backed up against the washer and dryer, telling Tommy to get away and to leave her alone. He threw his hands in the air and said, "You wouldn't shoot me in the damn back," and turned around and walked off. She came to the kitchen door and Tommy turned back around and lunged at her and she shot him. He then took two staggering steps and fell over. She started crying, tried to help him, and was begging him to talk to her. Geneva grabbed her and pulled her out the door. They went to Geneva's house and she put on a pair of slacks, as she had been partially disrobed. Geneva told her that she would get her some money and send her to Tacoma, Washington, where her mother was. She testified that she was still in a dazed condition and agreed to go to town with Geneva. They stopped near Ward's store and Geneva got out. When Geneva did not return, she got out of the truck and was trying to find Geneva, when Bill Reynolds grabbed her.

She testified that on April 19, Tommy had beaten her up and that she had stayed at her sister's house approximately one week. He begged her to return home and when she agreed, he again beat her and choked her. She testified further that she first met Tommy French in 1949, and married him on July 18, 1951. She testified that he was kind and sweet, and that she was deeply in love with him, even though she knew that he had served time in the penitentiary for murder and was on parole. Defendant introduced a copy of the jury verdict and conviction of Tommy French, Jr., wherein he was sentenced to life imprisonment for the crime of murder on March 13, 1933. She testified that she loved him very much, but was also a little bit afraid of him, and that during the early years of their marriage she would do anything that he asked her to do. She testified that he was a big man, weighing approximately 240 pounds. After they had been married approximately one year, Tommy French asked her to be a prostitute for him and told her that they could make a lot of money. Through his efforts, she became a prostitute working out of a hotel in Tulsa. She worked for approximately eight or nine years, using the name of Helen Rogers. She would work ten days to two weeks at a time and would always give the money to Tommy. The defendant introduced a copy of her police record showing convictions of vagrancy and prostitution in the City of Tulsa. She testified that she learned of some trouble that Tommy French was involved in at Webbers Falls in October of 1957, when she read an article in the newspaper. Defendant introduced a copy of the newspaper article, which reflected that Tommy French was charged with aggravated assault and battery, wherein he struck a woman with his fists and struck a man in the eye with a bottle. She testified that on January 25, 1959, she again read in the newspaper about some trouble that Tommy and his brother got into at Muskogee. Defendant introduced a copy of a newspaper article

which reflected that Tommy and his brother, Jimmy, were charged with assault with a dangerous weapon when they beat a service station attendant who refused to cash their check. The article further reflected that they both resisted when the detectives attempted to arrest them. In March of 1960, she accompanied her husband to a horse and mule sale at Fort Smith, Arkansas. They stayed in a hotel overnight, and her husband tried to get her to have intercourse with the bellboy. When she refused, he started beating her with a boot about the head and arms. He then took out a knife and scratched her across the stomach. The following day she had to be treated by a doctor in Muskogee.

In 1953, Tommy got into an argument with her brother-in-law and beat him with a lug wrench. They drove to her father's house and Tommy kicked the brother-in-law out of the car, unconscious. He then went into the house, got a butcher knife, and started gouging the brother-in-law in the head.

In January of 1962 or 1963, she went to Fort Smith, where the defendant was in the hospital after being shot in the leg. Tommy told her about running everybody out of a horse ring with a knife, and when the officers attempted to arrest him, he tried to cut the officers and was shot.

In June of 1963, he cut her across both hands with his knife when she tried to get him to leave a bar. She went back outside to the pickup and Tommy followed her out, jerked her from the pickup, and cut her in the back with his knife, causing her to be hospitalized. She testified that she never told the doctors what had actually happened because she was afraid of what Tommy would do.

In October of 1965, he again tried to make her have intercourse with a bellboy in Muskogee. Tommy had a gun, and the bellboy ran from the room. Tommy then proceeded to beat her about the head and body with the pistol. On this occasion, she did report the incident to the sheriff and caused charges to be filed against her husband.

Shortly after this occasion, she read in the newspaper about further trouble that Tommy had gotten into at Fort Gibson. A newspaper article was introduced which reflected that Tommy French was charged with public drunk when he allegedly harassed and threatened an elderly couple at their home.

In April of 1966, he gouged her in the face with a knife, and shortly thereafter went to California. While in California, he was charged with knifing a "colored" man, which was subsequently dismissed.

In June, 1966, he beat her with a lug wrench and she filed for divorce. They subsequently went back together.

On cross-examination, she admitted other convictions for aggravated assault, escape from jail, illegal transportation of an open bottle, being under the influence of alcohol, assault and battery, and in addition, convictions for prostitution and vagrancy in the City of Tulsa.

W. C. Gilliam testified that he was employed in the years of 1962 and 1963 as the Constable of Moffit. On one occasion, he answered a disturbance call at the sale barn in Moffit. Upon arriving, he observed Tommy French holding a knife at a man's throat. French attempted to stab him with a knife when he placed him under arrest. He was forced to shoot French in the left leg to stop him from attacking him. He continued to resist after being shot, and it took three or four persons to subdue him.

Sheriff Vinzant testified that, in his opinion, the general reputation of Tommy French in the community was bad.

 The first proposition asserts that the verdict is contrary to the law in complete disregard to the instructions of the court. We observe that the record reflects that the trial court gave the jury six separate instructions defining justifiable homicide and self-defense. The State's witness, L. D. and Geneva Hamlin, both testified that the defendant had previously stated that she was going to kill her husband. Geneva Hamlin testified that

# 859

Tommy French was not attacking the defendant at the time the shot was fired, while the defendant testified that he lunged at her prior to her firing the shot. The jury obviously chose to believe the State's witness. We have consistently held that where there is competent evidence in the record from which the jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence, and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and to determine the facts. Jones v. State, Okl.Cr., 468 P.2d 805. We, therefore, find this proposition to be without merit.

■ The second proposition contends that the trial court erred in failing to instruct the jury that evidence of defendant's previous convictions could be considered only as to affect her credibility. In dealing with a similar proposition in Rose v. State, Okl.Cr., 478 P.2d 1013, Judge Brett stated:

"The question raised by defendant deals with the effect of the trial court's failure to instruct the jury that the evidence of defendant's previous convictions could be considered only as to how they might affect defendant's credibility as a witness when he testified in his own behalf.

"Ordinarily, this Court will not consider failure to instruct the jury on matters relating to the weight of evidence in the absence of a requested instruction. In this case defendant did not request the instruction concerning which he complains. This Court will, therefore, follow its well established rule that the absence of such instruction does not constitute reversible error. * * *"

In the instant case, the defendant introduced a copy of her Tulsa "rap sheet" into evidence in her case in chief, attempting to show the bad character of the deceased in leading her to become a prostitute. Defendant further failed to request an instruc-

tion that her prior convictions could only be used to affect her credibility. We, therefore, hold that the trial court's failure to so instruct does not constitute fundamental error.

■ The third proposition asserts that the court erred in failing to instruct the jury on manslaughter in the second degree. We are of the opinion that this proposition is without merit. Defendant's theory of defense was not that of negligence or accident, but rather was that of self-defense. The record reflects that the defendant did not request an instruction on manslaughter in the second degree. In Moore v. State, 97 Okl.Cr. 187, 260 P.2d 410, we stated in Syllabus Four:

"In the absence of a request, the court did not err in failing to submit the issue of manslaughter in the second degree to the jury by proper instruction, especially was this true where there was a lack of evidence establishing any of the elements of a manslaughter in the second degree."

We, therefore, find this proposition to be without merit.

■ The fourth proposition contends that the court erred in not allowing the defendant to introduce evidence regarding the general reputation of the deceased as being a "quarrelsome, belligerent and dangerous individual." The defendant argues that she was improperly restricted in the questioning of Sheriff Bill Vinzant as to whether Tommy French was known as a "turbulent, dangerous and belligerent individual," and limiting the defendant to asking the question whether his reputation was good or bad. We have previously held that where a defendant has laid a proper foundation by competent evidence tending to show that in committing a homicide he acted in self-defense, evidence of the turbulent, dangerous character or reputation of the deceased may be properly introduced. See Roberson v. State, 91 Okl.Cr. 217, 218 P.2d 414. We are of the opinion that, although the trial court erred in not allowing the defendant to question the sheriff as

to his knowledge of the deceased's reputation as a turbulent, dangerous and belligerent person that the same constitutes harmless error in view of the abundance of testimony and the exhibits introduced by the defendant which established beyond question the turbulent and dangerous character of the deceased.

The final proposition asserts that the punishment is excessive, given under the influence of passion and prejudice. We are of the opinion that the evidence of the State of Oklahoma, if believed, was sufficient to warrant conviction for the offense of murder; however, the jury, apparently taking into consideration the unsavory character of the deceased, found the defendant guilty of manslaughter and assessed punishment at fifteen (15) years imprisonment. Considering the errors previously discussed which were not sufficient to warrant reversal, we are of the opinion that justice would best be served by modifying the judgment and sentence to a term of ten (10) years imprisonment, and as so modified, if affirmed. Modified and affirmed.

BRETT and SIMMS, JJ., concur.